**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RHONDA S. MASON, | ) | CASE NO.  4:18CV00865 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Rhonda S. Mason, ("Plaintiff" or "Mason"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before[2] the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

[2] On December 26, 2018, this matter was stayed due to the lapse of congressional
appropriations funding the federal government.  *See* General Order 2018-15.  The stay
was thereafter extended pursuant to General Order 2019-1.  As the government shutdown
has ended, the stay imposed by General Orders 2018-15 and 2019-1 is hereby lifted.

1

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In September 2013, Mason filed an application for POD and DIB, alleging a disability

onset date of September 3, 2013 and claiming she was disabled due to osteoarthritis, depression,

bone deterioration, total hip replacement, and fatigue.  (Transcript ("Tr.") 289, 325.)  The

applications were denied initially and upon reconsideration, and Mason requested a hearing

before an administrative law judge ("ALJ").  (Tr. 159, 166, 173.)

On July 16, 2015, an ALJ held a hearing, during which Mason, represented by counsel,

and an impartial vocational expert ("VE") testified.  (Tr. 65.)  On August 11, 2015, the ALJ

issued a written decision finding Mason was not disabled.  (Tr. 131.)  Mason requested the

Appeals Council review this decision.  (Tr. 221.)  On September 20, 2016, the Appeals Council

vacated the August 11, 2015 ALJ decision and remanded the matter back to the ALJ for further

proceedings and a new decision.  (Tr. 156, 157.)

On March 29, 2017, an ALJ held a hearing, during which Mason, represented by counsel,

and an impartial vocational expert ("VE") testified.  (Tr. 48.)  On May 18, 2017, the ALJ issued a

written decision finding Mason was not disabled.  (Tr. 7.)  The ALJ's decision became final on

February 14, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On April 16 2018, Mason filed her Complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 15, 20.)

Mason asserts the following assignments of error:

(1)    The ALJ's decision should be reversed and remanded because he failed to
provide good reasons for not according controlling weight to Dr. Kaza's

2

treating source mental health opinions.

(2)    The ALJ's decision should be reversed and remanded because he failed to properly consider whether Ms. Mason's severe orthopedic impairments met or equaled Listing 1.02A.

(3)    The ALJ's decision should be reversed and remanded because he failed to explain how Ms. Mason's physical condition improved from the time of the vacated ALJ decision.

(Doc. No. 20.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Mason was born in November 1967 and was 49 years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 27.)  *See* 20 C.F.R. §§ 404.1563(c).  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a nurses' aid and housekeeping supervisor.  (*Id.*)

### B.    Medical Evidence[3]

#### 1.    Mental Impairments

On August 23, 2013, Mason visited her primary care physician, Rekha Parulkar, M.D., reporting she was stressed, depressed, and could not focus.  (Tr. 480.)  She requested Dr. Parulkar discontinue her Cymbalta prescription and prescribe a different antidepressant.  (*Id.*)

On March 21, 2014, Mason first visited Comprehensive Behavioral Health for an adult

---

[3]    The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Moreover, the Commissioner, in her Errata Statement, cites generally to large swaths of evidence.  (*See* Doc. No. 18 at 1, 2.)  This does not comply with the Court's Order, which specifically provides the brief "shall cite, by exact and specific transcript page number, the pages relating" to the facts at issue.  (Doc. No. 7 at 3.)

diagnostic assessment. (Tr. 585.) She reported depression and stressors related to her family and physical health. (*Id.*) She described trouble focusing and poor sleep. (Tr. 593.) Her mood was depressed and anxious upon examination. (Tr. 597.) Social worker Amy Frampton, LISW-S, diagnosed adjustment disorder and assigned her a Global Assessment of Functioning ("GAF") score[4] of 45. (Tr. 594.)

On March 28, 2014, Mason underwent an initial psychiatric evaluation at Comprehensive Behavioral Health. (Tr. 581.) She reported multiple family-related stressors and life-long depression. (*Id.*) Mason was diagnosed[5] with adjustment disorder and prescribed Cymbalta. (Tr. 583, 584.)

On October 7, 2014, Mason saw psychiatrist Koteswara Kaza, M.D., at Comprehensive Behavioral Health. (Tr. 598.) She reported her mood was improved, but was "not sure if Cymbalta works any more." (*Id.*) She was able to focus with her Adderall and her sleep was "good." (*Id.*) She returned to Dr. Kaza on November 4, 2014. (Tr. 615.) She reported her Cymbalta was not effective, but her Adderall was doing "wonders." (*Id.*) On examination, Mason's mood was stable, anxiety decreased, and focus "good." (*Id.*) Mason returned to Dr. Kaza on December 2, 2014, reporting her Adderall continued to work well and her sleep was

---

4 The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

5 The signature of the treating source who conducted this evaluation is not legible. (Tr. 584.)

improved.  (Tr. 613.)  She described difficulty coping with her brother's recent death.  (*Id.*)  On

December 30, 2014, she reported her holidays had been difficult due to her brother's death.  (Tr.

611.)  However, on examination, her mood was "rather bright," her thought process was logical,

and she denied suicidal ideation.  (*Id.*)

On January 27, 2015, Mason was "doing good," but her anxiety level was "a little high."

(Tr. 609.)  She continued to struggle with her brother's death, but denied any panic attacks, was

sleeping, and was able to focus and concentrate.  (*Id.*)  On February 24, 2015, Kaza noted

Mason's concentration, focus, and depression were all improved.  (Tr. 607-608.)  On March 24,

2015, Mason reported she recently spent an entire day in bed because it was her deceased

brother's birthday.  (Tr. 605.)  She indicated her anxiety was decreased on medications.  (*Id.*)

On April 21, 2015, Mason described increased stress and continued difficulty coping with

her brother's death.  (Tr. 604.)  She reported she planned on taking an 8-week grief counseling

course at a local funeral home.  (*Id.*)  Dr. Kaza observed Mason's concentration, depression, and

anxiety were all improved on medications.  (*Id.*)  On May 19, 2015, Mason's mood was bright

and her thoughts were organized.  (Tr. 602.)  Her medications continued to help her

concentration and anxiety.  (*Id.*)

Mason returned to Dr. Kaza on June 15, 2015, indicating she completed her grief

counseling and it had been helpful.  (Tr. 600.)  On examination, Mason's mood was bright, her

thought process organized, and she was talkative.  (*Id.*)  Dr. Kaza prescribed Trazadone for

depression and sleep, Ativan, Visteril, and Buspar for anxiety, and Adderall for concentration.

(*Id.*)

On August 11, 2015, Dr. Kaza filled out a form entitled "Medical Assessment of Ability

5

to do Work-Related Activities(Mental)"on behalf of Mason.  (Tr. 683-686)  Dr. Kaza opined

Mason was markedly limited in her abilities to (1) interact with supervisors; (2) deal with work

stress; (3) function independently; (4) maintain attention/concentration; and (5) understand,

remember, and carry out detailed and complex job instructions.  (Tr. 683-684.)  Dr. Kaza found

Mason was moderately limited in her abilities to (1) follow work rules; (2) relate to co-workers;

(3) deal with the public; (4) use judgment; (5) understand, remember, and carry out simple job

instructions; (6) behave in an emotionally stable manner; (7) relate predictably in social

situations; and (8) demonstrate reliability.  (*Id*.)  Dr. Kaza opined Mason had no significant

limitation in her ability to maintain personal appearance.  (Tr. 684.)  Dr. Kaza concluded Mason

had (1) no restrictions in activities of daily living; (2) slight difficulties in maintaining social

functioning; (3) marked deficiencies of concentration, persistence, or pace; and (4) moderate

episodes of deterioration in work or work-like settings.  (Tr. 686.)

On December 4, 2015, Mason underwent a psychiatric reassessment reevaluation at

Comprehensive Behavioral Health with nurse practitioner Praveena Sharma, N.P, at

Comprehensive Behavioral Health.  (Tr. 736.)  Mason described ongoing depression and poor

focus.  (*Id*.)  However, she also reported her medications were effective.  (Tr. 737.)  Mason

reported two separate periods during which she remained in bed for two days.  (Tr. 740.)  She

also indicated she enjoyed buying used doll houses and refurbishing them.  (Tr. 738.)  She was

tearful and her mood was depressed.  (Tr. 740, 742.)  However, her sleep was improving and her

thought process was logical.  (Tr. 741, 742.)  Mason admitted she used marijuana a few times

each week.  (Tr. 743.)  Ms. Sharma advised her to discontinue using marijuana.  (Tr. 744.)

Mason visited physicians' assistant Maria Craig, MPAS, PA-C, at Comprehensive

Behavioral Health on February 5, 2016.  (Tr. 791.)  Mason reported she was unable to obtain her medications due to an recent switch in health insurance.  (*Id*.)  She reported mood swings and a high level of anxiety without her medications.  (*Id*.)  Mason returned to Ms. Craig on March 11, 2016, reporting continued health insurance issues.  (Tr. 786.)  She felt overwhelmed and described several family-related stressors.  (*Id*.)  Ms. Craig adjusted Mason's medications to account for new insurance coverage.  (Tr. 788.)  Mason admitted she continued to use marijuana and Ms. Craig ordered monthly urine drug screens.  (Tr. 788-789.)

On April 8, 2016, Mason reported to Ms. Craig she was feeling overwhelmed due to multiple family conflicts and stressors.  (Tr. 781.)  She continued to feel overwhelmed and stressed over her family-related conflict on May 6, 2016.  (Tr. 777.)  On June 7, 2016, Mason indicated she was an "emotional mess" and "overwhelmed."  (Tr. 772.)  She reported her medications did help with her focus, anxiety, and depression.  (*Id*.)  On July 5, 2016, Mason indicated her medications were working and her anxiety and sleep had improved.  (Tr. 768.)  She denied any panic attacks but continued to have depression.  (*Id*.)

On November 22, 2016, Mason reported continued family-related stressors and arguments at home.  (Tr. 751.)  She described depression over her family situation, as well as feelings of worthlessness.  (*Id*.)  Ms. Craig encouraged Mason to attend counseling and increased her Ativan dosage.  (Tr. 753.)  Mason returned to Ms. Craig on December 20, 2016, again indicating her home life was stressful.  (Tr. 747.)  She reported her medications were working "okay," but requested counseling.  (*Id*.)  Ms. Craig encouraged her to make an appointment to see a counselor that day.  (Tr. 749.)

On January 25, 2017, Ms. Craig submitted the following statement regarding Mason:

I am writing in response to your letter dated January 11, 2017 in regards to Rhonda Mason, (DOB 11/**/1967). Ms. Mason is known to me as she is a patient in our clinical practice. I have seen her on a regular basis since March 2016, although she has been a patient here since 2014.

Ms. Mason carries a diagnoses of ADHD, GAD, MDD and agoraphobia for which she has been treated with multiple medicines and Cognitive Behavioral Therapy.

She was assessed by Dr. McArthur in 2014 and met the criteria for ADHD at that time and was placed on stimulant medication.

She has persistent depression and anxiety, which waxes and wanes according to family issues. Her mood is labile and depends mostly on the situation, her daughter and household. At times she self-isolates to avoid conflicts. She is known to experience increased panic attacks when in public situations.

I have reviewed the report provided and agree that Ms. Mason has a mood disorder and anxiety disorder, but I would add psychological testing and assessment indicated ADHD as well.

(Tr. 892.)

### 2. Physical Impairments

Mason underwent a total left hip arthroplasty on March 15, 2010. (Tr. 404, 400.) This surgery resulted in a complete resolution of her pain prior to surgery. (Tr. 413.) On August 2, 2011, Mason was involved in a motor vehicle accident and presented to the emergency room with right hip and neck pain. (Tr. 444.) On examination, Mason displayed tenderness and a painful range of motion in her right hip and knee. (Tr. 446.) Cervical spine and knee x-rays were negative for any acute injury. (*Id.*) Mason was provided with IV Toradol for pain. (*Id.*)

On February 22, 2012, Mason visited orthopedic surgeon Timothy P. Domer, D.O., for left hip pain. (Tr. 413.) She indicated while her pre-surgical symptoms were completely resolved, she had developed left buttock pain. (*Id.*) On examination, Mason's surgical scar was

well healed and a "very aggressive" range of motion in her left hip was "completely pain free." (*Id*.) She had strong hip flexion, extension, and abduction. (*Id*.) Her knee and ankle flexion were strong as well. (*Id*.) Updated x-rays of her left hip revealed her left hip implant was in good position. (*Id*.) Dr. Domer advised Mason this was likely "some sciatica and/or possible piriformis tendonitis" which would resolve. (*Id*.)

On September 16, 2013, Mason visited her primary care doctor, Rekha Parulkar, M.D., requesting an "excuse for work"due to torn cartilage in her chest. (Tr. 479.) She reported she "cannot work anyway" because she was in "too much pain." (*Id*.) She described back pain to Dr. Parulkar on October 28, 2013 and December 27, 2013. (Tr. 478, 477.)

On December 27, 2013, Dr. Parulkar filled out a "Physical Capacity Evaluation" form regarding Mason. (Tr. 526-528.) Dr. Parulkar found the following limitations for Mason:

- She can stand and walk for less than one hour in an eight-hour workday;

- She can sit for two hours in an eight-hour workday;

- She can occasionally lift and carry less than 10 pounds;

- She can frequently lift and carry less than 10 pounds;

- She can use her hands for simple grasping and handling, pushing and pulling, and fine manipulation and fingering;

- She cannot use her feet for repetitive movements, such as foot controls;

- She can occasionally bend, kneel, and climb stairs;

- She can never squat, crawl, or climb stairs;

- She can reach above shoulder level;

- She can tolerate no stress; and

9

- She is not required to keep her legs elevated above her heart.

(Tr. 526-527.)  Dr. Parulkar reported Mason had been a patient since August 2009 and listed he

diagnoses as severe degenerative joint disease at the back and hips.  (Tr. 528.)

Mason returned to Dr. Parulkar on December 23, 2014, reporting depression, anxiety, and

"mild back pain."  (Tr. 575.)  She denied any cervical pain from her motor vehicle accident and

Dr. Parulkar noted she did "not need to be seen again for this issue.  (*Id*.)  On examination,

Mason displayed cervical tenderness.  (Tr. 576.)  Dr. Parulkar prescribed Percocet, Vitamin D,

and Seroquel.  (*Id*.)  On January 20, 2015, Mason reported increased back pain to Dr. Parulkar.

(Tr. 578.)  On examination, she had paraspinal muscle spasm on the left side and a positive

straight leg raise bilaterally.  (Tr. 579.)  Dr. Parulkar prescribed Cymbalta, Percocet, and

Seroquel.  (*Id*.)

On May 26, 2015, Mason reported left leg and hip pain.  (Tr. 699.)  On examination, she

had left hip and leg tenderness, but a normal spinal examination and no edema.  (Tr. 700.)  Dr.

Parulkar prescribed Percocet.  (*Id*.)

Mason followed up with Dr. Parulkar on April 5, 2016, reporting bilateral hip pain, her

left side worse than the right.  (Tr. 867.)  On examination, Mason had bilateral hip tenderness,

bilateral paraspinal muscle spasm, and cervical and lumbar spine tenderness.  (Tr. 868.)  Her

motor strength and gait were normal.  (*Id.*)  On May 17, 2016, Mason had a full range of motion

and no tenderness in her spine.  (Tr. 871.)  She had bilateral hip and knee tenderness, but her

motor strength and gait were normal.  (*Id.*)  Dr. Parulkar prescribed Percocet.  (Tr. 872.)

On June 28, 2016, Mason was tender to palpation over the lumbar and cervical spine.

(Tr. 874.)  She had bilateral paraspinal muscle spasm  and positive straight leg raises.  (*Id.*)  Her

10

motor strength and gait were normal.  (*Id*.)  Dr. Parulkar prescribed Seroquel, Vitamin D supplements, and Percocet.  (Tr. 875.)

Mason began to see a new primary care physician, Atul Shetty, M.D., on March 9, 2017. (Tr. 893.)  She ambulated with a cane during the office visit.  (Tr. 894.)  On examination, Mason had a decreased range of motion in her knees and spine.  (Tr. 894.)  Dr. Shetty diagnosed polyosteoarthritis, depression, and migraines.  (*Id*.)  He prescribed Percocet, Rizatriptan, Seroquel, and Vitamin D.  (Tr. 895.)

**C.      State Agency Reports**

**1.      Mental Impairments**

On October 21, 2013, Mason underwent a consultative examination with psychologist Vernon E. Brown, Ph.D.  (Tr. 465.)  She reported osteoarthritis and depression.  (Tr. 467.)  She denied any "outpatient mental health treatment in any type of mental health facility."  (*Id*.)  She indicated her primary care physician, Dr. Parulkar, has treated her depression for years.  (Tr. 467-468.)  During the evaluation, Mason's speech and flow of conversation were normal.  (Tr. 468.) Her mood was "severely dysphoric" and she was tearful during the interview.  (*Id*.)  She described sadness, daily crying spells, anxiety, and worry.  (Tr. 468-469.)  She denied suicidal ideation, hallucinations, or paranoia.  (Tr. 469.)  Mason's concentration was impaired, but her immediate recall, insight, and judgment were good.  (Tr. 470-471.)  Dr. Brown estimated Mason was functioning in the average range of intellectual functioning.  (Tr. 470.)

Based upon this examination, Dr. Brown diagnosed Mason with a mood disorder and major depressive disorder.  (Tr. 472.)  He assigned Mason a GAF score of 50.  (*Id*.)  Dr. Brown provided the following discussion regarding Mason:

11

<u>Describe the claimant's abilities and limitations in understanding,
remembering, and carrying out instructions.</u>

Ms. Mason's ability to understand, remember and carry out instructions
remains intact.  Her immediate recall was good and her insight was good.

<u>Describe the claimant's abilities and limitations in maintaining attention and
concentration, and in maintaining persistence and pace, to perform simple
tasks and to perform multi-step tasks.</u>

Ms. Mason's ability to do simple and complex tasks with adequate
persistence and pace remains intact for simple tasks but somewhat impaired
for complex tasks.  She exhibited some noted difficulty with concentration.

This opinion is offered without regard to any physical conditions.

<u>Describe the claimant's abilities and limitations in responding appropriately
to supervision and to coworkers in a work setting.</u>

Ms. Mason's ability to respond appropriately to supervisors and coworkers is
probably significantly impaired by current levels of depression and anxiety
which have increased since she resigned.  She reported that she is having
problems at home and that she is no longer seeing her friends.

<u>Describe the claimant's abilities and limitations in responding appropriately
to pressures in a work setting.</u>

Ms. Mason's ability to tolerate the normal pressures in a work setting is
notably impaired by current levels of depression and anxiety

Ms. Mason has no impairment in her ability to manage any benefits that she
may receive in her own best interest.

(Tr. 473.)

On October 29, 2013, state agency physician Mel Zwissler, Ph.D., reviewed Mason's

records and completed a Psychiatric Review Technique ("PRT").  (Tr. 106.)  Dr. Zwissler

concluded Mason had (1) mild restrictions in activities of daily living; (2) moderate difficulties in

maintaining social functioning; (3) moderate difficulties in maintaining concentration,

persistence, and pace; and (4) no episodes of decompensation.  (*Id.*)  Dr. Zwissler also filled out a

12

Mental Residual Functional Capacity ("RFC") Assessment, in which she concluded Mason was moderately limited in her abilities to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) respond appropriately to changes in the work setting.  (Tr. 108-110.)  Dr. Zwissler also found Mason was not significantly limited in her abilities to (1) understand and remember detailed instructions; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them; (5) ask simple questions or request assistance; (6) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (7) travel in unfamiliar places or use public transportation; and (8) set realistic goals or make plans independently of others.  (*Id*.)  Dr. Zwissler found no evidence of any limitation in Mason's abilities to (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) make simple work-related decisions; and (4) be aware or normal hazards and take appropriate precautions.  (*Id*.)

> Dr. Zwissler explained the basis of her decision as follows:
>
> ability to complete complex tasks is somewhat impaired, she exhibited some [difficulty with] concentration and pace.  Can carry out simple routine tasks without strict time demands.

13

> ***
>
> retains capacity for occasional superficial interactions [with] general public
> and ability to respond [appropriately] to supervisors and coworkers.
>
> ***
>
> ability to tolerate [normal] pressures in work setting is notably impaired,
> retains capacity for occasional expected changes in work setting.

(Tr. 109-110.)

On January 13, 2014, Mason underwent another consultative examination with Vernon E. Brown, Ph.D.  (Tr. 530.)  She reported she was still only receiving mental health treatment from her primary care doctor, Dr. Parulkar.  (Tr. 533.)  She was "severely dysphoric" on examination, tearful, depressed, and anxious.  (*Id.*)  She described excessive worry, a dislike of crowds, and anger.  (Tr. 534.)  She indicated her memory was getting worse and her immediate recall ability was poor on examination.  (Tr. 535.)  Her ability to concentrate was "somewhat impaired," but her insight and judgment were good.  (Tr. 535, 536.)  However, Mason "did not appear to grasp the extent of her depression, nor did she associate her problems with concentration with increased depression."  (Tr. 536.)

Based upon this examination, Dr. Brown diagnosed major depressive disorder and anxiety disorder.  (Tr. 537.)  He assessed a GAF score of 40, observing Mason reported "she is worse now than when I saw her previously and I agree."  (*Id.*)  Dr. Brown provided the following functional assessment of Mason:

> Describe the claimant's abilities and limitations in understanding,
> remembering, and carrying out instructions.
>
> Ms. Mason's ability to understand, remember and carry out instructions is
> significantly impaired.  She described difficulty completing daily activities
> because of difficulty focusing and her immediate recall ability was poor.

14

> Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.
>
> Ms. Mason's ability to do simple and complex tasks with adequate persistence and pace is somewhat impaired for even simple tasks and significantly impaired for complex tasks such as shopping.
>
> This opinion is offered without regard to any physical conditions.
>
> Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.
>
> Ms. Mason's ability to respond appropriately to supervisors and coworkers is at least significantly impaired. She was appropriate but dysphoric and overwhelmed during the interview. It was suggested that she seek services for the problems she is having at home and that she let her primary care provider know how depressed she is.
>
> Describe the claimant's abilities and limitations in responding appropriately to pressures in a work setting.
>
> Ms. Mason's ability to tolerate the normal pressures in a work setting is notably impaired by severe levels of depression and anxiety.

(Tr. 538.)

On January 27, 2014, state agency physician Todd Finnerty, Psy.D., filled out a PRT and Mental RFC. (Tr. 122, 126-127.) Dr. Finnerty concluded Mason had (1) moderate restrictions in activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 122.) Dr. Finnerty also filled out a Mental RFC, in which he concluded Mason was moderately limited in her abilities to (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the

15

general public; (5) accept instructions and respond appropriately to criticism from supervisors;

(6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

and (7) respond appropriately to changes in the work setting.  (Tr. 126-127.)  Dr. Finnerty also

found Mason was not significantly limited in her abilities to (1) carry out very short and simple

instructions; (2) perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; (3) sustain an ordinary routine without special supervision;

(4) work in coordination with or in proximity to others without being distracted by them; (5)

make simple-work related decisions; (6) ask simple questions or request assistance; (7) maintain

socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (8) be

aware of normal hazards and take appropriate precautions; (9) travel in unfamiliar places or use

public transportation; and (10) set realistic goals or make plans independently of others.  (*Id*.)

Dr. Finnerty found no evidence of any limitation in Mason's abilities to understand and

remember.  (Tr. 125.)

> Dr. Finnerty explained the basis of his decision as follows:
>
> The [claimant] can sustain simple tasks without fast pace.
>
> ***
>
> The [claimant] can interact with others superficially.
>
> ***
>
> The [claimant] has no [history] of pursuing mental health treatment or
> evidencing a requirement for intensive interventions, the [claimant] can adapt
> to a static setting without frequent changes.

(Tr. 126-127.)

> On December 20, 2016, Mason underwent a consultative examination with psychologist

16

David Bousquet, M.Ed.  (Tr. 723.)  Mason reported depression and anxiety.  (Tr. 724.)  She indicated her medications were helpful, as she was calmer at night and not as depressed.  (*Id*.)  She described crying spells and difficulty with attention and concentration.  (Tr. 725.)  During the examination, her mood was depressed and anxious and she had difficulty maintaining attention and concentration.  (Tr. 727.)

Based upon this examination, Dr. Bousquet diagnosed Mason with disruptive mood disregulation disorder and unspecified anxiety disorder.  (Tr. 729.)  Dr. Bousquet provided the following functional assessment:

> 1.  During the interview she stated that when working she never had any problems with understanding, carrying out or remembering job assignments and duties.  The results of the cognitive screening suggest skills that fall in the low average range.  This information would indicate that she has the abilities to complete simple and multi-step tasks.  Overall, the interview indicates that she has the abilities to understand, carryout and remember instructions and directions.
>
> 2.  During the interview she stated that when working in her judgment she did not have any problems with sustaining attention and concentration and denied problems with maintaining an acceptable persistence and pace in a work area.  However she does state that she has not been employed in the past 3 years.  During the interview she demonstrated consistent problems with attending and concentrating but was able to be refocused.  She describes having difficulties with her overall persistence and pace and generally has to force herself to engage in any type of activity.  She has very little energy.  She states that she has to push herself to do any type of task or chore.  The available information indicates that at this time she would be expected to have problems with abilities to maintain attention and concentration and also with abilities to maintain an acceptable persistence and pace in a work setting.  Again, she did demonstrate issues with increased anxiety and also increased difficulties attending and concentrating when the stress of the interview increased.
>
> 3.  She stated that when working she did not have any problems with maintaining effective social interactions on a consistent and independent basis with supervisors, coworkers and with the public.  She denies having any significant issues with her interpersonal relationships.  In spite of having

problems with depression and anxiety she continues to have a good
relationship with her spouse and with her mother.  She does acknowledge
having difficulties relating with one of her daughters.  The available
information indicates that from an emotional and psychological perspective
she has abilities to conform to social expectations in a work setting.

4.  She did state that when working there were times when she would strugle
with managing work related stresses and/or pressures but would not allow
herself to express these problems until "I got home."  She states that
currently under the conditions of stress and pressure she becomes tearful 2 or
3 times a week.  She reports being moody but when frustrated or angry she
will cry or withdraw herself and sleep.  She also becomes anxious, she
worries and she is fearful.  The available information indicates that from an
emotional and psychological perspective there will be times when she will
have some difficulties with abilities to respond appropriately to work place
stresses and pressures.

(Tr. 729-730.)  Dr. Bousquet also filled out a form entitled "Medical Source Statement of Ability

to Do Work-Related Activities(Mental)" regarding Mason.  (Tr. 719-720.)  Within this form, Dr.

Bousquet found Mason was not limited in her abilities to (1) understand, remember, and carry

out simple instructions; (2) make judgments on simple work-related decisions; and (3) interact

appropriately with the public, supervisors, and co-workers.  (*Id.*)  Dr. Bousquet opined Mason

was mildly limited in her abilities to (1) understand, remember, and carry out complex

instructions; (2) make judgments on complex work-related decisions; and (3) respond

appropriately to usual work situations and to changes in a routine work setting.  (*Id*.)  Dr.

Bouquest observed Mason's "anxiety may influence her relationships as well as depression."

(Tr. 720.)

## 2.        Physical Impairments

On November 17, 2016, Mason underwent a consultative examination with consulting

physician Sushil M. Sethi, M.D.  (Tr. 716.)  She described a "full recovery" following her 2010

left hip replacement.  (*Id.*)  She reported arthritis in her hands, knees, and hips, as well as anxiety

and depression. (*Id.*) On examination, Mason had "marked tenderness on deep pressure" in her

left hip. (Tr. 717.) Her knees, ankles, shoulders, elbows, and wrists had a normal range of

motion, and she could walk and squat. (*Id.*) She was not using an ambulatory aid and her

straight leg raising test was negative. (*Id.*) Her grasp and fine motor coordination were normal.

(*Id.*) Mason displayed decreased cervical and lumbar spine range of motion. (Tr. 713, 714.) Her

bilateral hip range of motion was also decreased. (Tr. 715.)

> Based upon this examination, Dr. Sethi made the following conclusion:
>
> Based upon my objective findings, the claimant's ability to do work-related
> physical activities is slightly affected. She can sit, stand, and walk 8 hours
> in an 8 hour shift for 40 hours a week. She can carry 20-30 pounds
> frequently and 50-60 pounds occasionally. Her hearing, speaking, and
> traveling are normal.

(Tr. 718.) Dr. Sethi also filled out a form entitled "Medical Source Statement of Ability To Do

Work-Related Activities(Phyiscal)" regarding Mason. (Tr. 706-711.) Dr. Sethi found Mason

had the following limitations/abilities:

- She can continuously lift/carry up to 20 pounds;

- She can frequently lift/carry up to 50 pounds;

- She can occasionally lift/carry up to 100 pounds;

- She can sit for 6 hours at one time and 8 hours total in an 8-hour
  workday;

- She can stand/walk for 4 hours at one time and 6 hours total in an 8-
  hour workday;

- While she carries a cane, it is not necessary and she does not require
  a cane to ambulate;

- She can continuously reach, handle, finger, feel, push, and pull
  bilaterally;

19

- She can continuously use bilateral foot controls;

- She can continuously climb stairs, ramps, ladders, scaffolds, balance, stoop, kneel, crouch, and crawl;

- She can continuously tolerate exposure to unprotected heights, moving mechanical parts, humidity and wetness, dusts, odors, fumes, and pulmonary irritants, extreme cold and heat, and vibrations; and

- She can operate a motor vehicle.

(*Id.*)

On October 22, 2013, state agency physician Leon D. Hughes, M.D., reviewed Mason's medical records and completed a Physical RFC Assessment.  (Tr. 107-108.)  Dr. Hughes determined Mason could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for more than 6 hours in an eight-hour workday.  (*Id.*)

On December 27, 2013, state agency physician Gerald Klyop, M.D., reviewed Mason's medical records and completed a Physical RFC Assessment.  (Tr. 124-125.)  Dr. Klyop determined Mason could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for more than six hours in an eight-hour workday.  (Tr. 124.)  Dr. Klyop further found Mason could occasionally climb ramps, stairs, ladders, ropes, scaffolds, balance, stoop, kneel, crouch, and crawl.  (Tr. 124-125.)

**D.	Hearing Testimony**

During the July 16, 2015 hearing, Mason testified to the following:

- She is married and lives with her husband.  (Tr. 70.)  She has two adult daughters and a grandson.  (*Id.*)  She watches her grandson about eight hours a

20

week.  (Tr. 71.)

- She is able to drive.  (Tr. 73.)  She has a high school education.  (Tr. 75.)  She previously worked as a hotel supervisor from 2006-2013.  (Tr. 77.)  She stopped working because her health began to deteriorate and she was having trouble concentrating.  (*Id*.)

- She also worked as a nurses' aid.  (Tr. 78.)  She stopped this job in 2005 because her leg and hip began to hurt.  (Tr. 78-79.)

- She has arthritis and underwent hip surgery.  (Tr. 79-80.)  She takes medication for depression, anxiety, pain, and arthritis.  (Tr. 81.)

- She is able to dress herself.  (Tr. 81.)  Her daughter helps her cook meals and wash the dishes.  (Tr. 82.)  Her daughter also helps her with the housework, including changing her sheets and doing the laundry.  (Tr. 83.)

- She is depressed and cries five days a week.  (Tr. 88.)  She is sad because she cannot work and her brother recently passed away.  (*Id*.)  She struggles with concentration and memory.  (*Id*.)

- She has migraines 5 times a week.  (Tr. 90.)  These headaches will last all day and she will have to lie down and close her eyes.  (*Id*.)

- She can stand for about 30 minutes.  (*Id*.)  She cannot walk long distances and it hurts to sit for extended periods.  (Tr. 91.)

The VE testified Mason had past work as a nurse assistant (D.O.T. #355.674-014) and a housekeeper.  (D.O.T. ##321.137-010).  (Tr. 94.)

During the March 29, 2017 hearing, Mason testified to the following:

- Her condition has worsened since 2015.  (Tr. 53.)  She has trouble with her memory and her depression and anxiety have increased.  (*Id*.)  She stays in bed for days at a time.  (Tr. 54.)  She becomes frustrated and anxious when she is unable to complete certain tasks.  (*Id*.)  She is forgetful, which in turn makes her more depressed.  (*Id*.)

- Her depression will "wax and wane."  (Tr. 57.)  She has times where her depression will feel better and other days in which she will not want to leave her bed.  (*Id*.)

- She ambulates with a cane about three days a week.  (Tr. 56.)  She uses it due to

21

pain in her back and legs.  (*Id*.)  She has fallen a few times.  (Tr. 57.)

The ALJ then posed the following hypothetical question:

> [A]ssume a hypothetical individual of the same age, education as
> the Claimant, who retains the capacity to perform light work, with
> an allowance to alternate sitting or standing positions for up to two
> minutes, at 30 minute intervals, without going off task; who is
> limited to occasional posturals, except no climbing of ladders,
> ropes, or scaffolds; no kneeling, crouching, or crawling; who's
> limited to no repetitive rotation, flexion, or extension of the neck;
> requires a handheld assistive device only for uneven terrain or
> prolonged ambulation; and the contralateral upper extremity can be
> used to lift and carry up to exertional limits; must avoid
> concentrated exposure to extreme cold and heat, concentrated
> exposure to wetness and humidity, concentrated exposure to
> excessive noise and excessive vibration, concentrated exposure to
> irritants and chemicals, all exposure to unprotected heights,
> hazardous machinery, and commercial driving; who's work is
> limited to simple, routine, and repetitive tasks, requiring only simple
> decisions, with no fast-paced production requirements and few work
> place changes; must have no interaction with the public and only
> occasional interaction with co-workers and supervisors.

(Tr. 59.)

The VE testified the hypothetical individual would also be able to perform representative

jobs in the economy, such as a photocopy machine operator (D.O.T. #207.685-014); an inspector

of medical products (D.O.T. #559.687-074); and a collator (D.O.T. #653.687-010).  (Tr. 60.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

22

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Mason was insured on her alleged disability onset date, September 3, 2013, and

remains insured through December 31, 2018, her date last insured ("DLI.")  (Tr. 12.)  Therefore, in order to be entitled to POD and DIB, Mason must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.  (Exhibits 3D/1).

2.  The claimant has not engaged in substantial gainful activity since September 3, 2013, the alleged onset date (20 CFR 404.1571 et seq.).  (Exhibits 3D to 10D).

3.  The claimant has the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: history of left hip replacement; cardiomyopathy and cardiomegaly; lumbar and hip degenerative joint disease; osteoporosis; osteoarthritis, including osteoarthritis of the cervical spine; migraines; affective disorder/major depressive disorder/depression/adjustment disorder/depression/disruptions mood dysregulation disorder; and anxiety and unspecified anxiety disorder (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that involves lifting up to 20 pounds occasionally, lifting/carrying up to 10 pounds frequently, standing/walking for up to 6 hours, and sitting up to 6 hours in an 8-hour workday, with normal breaks and the following limitations: allowance to alternate sitting and standing positions for up to 2 minutes, at 30 minute intervals, without going off task; no more than occasional postural movements, except for no climbing of ladders, ropes,

or scaffolds; no repetitive rotation, flexion, or extension of the neck; requires a handheld assistive device only for uneven terrain or prolonged ambulation and the contralateral upper extremity can be used to lift and carry up to exertional limits; avoidance of concentrated exposure to extreme cold and heat, wetness and humidity, excessive noise, vibration, irritants such as fumes/odors/dust/poorly ventilated areas, and chemicals; avoidance of all exposure to unprotected heights, hazardous machinery, and commercial driving; limited to simple, routine, and repetitive tasks, requiring only simple decision, with no fast-paced production requirements and few workplace changes; no interaction with the public; and no more than occasional interaction with co-workers, and supervisors.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on November **, 1967 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 3, 2013, through the date of the decision (20 CFR 404.1520(g)).

(Tr. 12-29.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether

25

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

26

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.**     **Treating Source Opinion – Dr. Kaza**

In her first assignment of error, Mason argues the ALJ failed to properly evaluate the opinion of her treating psychiatrist, Dr. Kaza.  (Doc. No. 20 at 6.)  She asserts the ALJ "failed to provide the requisite good reasons for not according controlling weight to Dr. Kaza's medical source statement."  (*Id.*)  She maintains the "ALJ selectively read the mental health record and failed to consider the nature of Ms. Mason's psychological conditions."  (*Id.*)  Specifically,

27

Mason contends the ALJ "failed to address the fluctuating nature of Ms. Mason's psychological conditions." (*Id.* at 8.) She argues the fluctuating nature of her condition rendered her unemployable. (Doc. No. 15 at 2.)

The Commissioner maintains the ALJ properly considered Dr. Kaza's opinion. (Doc. No. 14 at 11.) She asserts the ALJ observed this opinion was inconsistent with Dr. Kaza's own treatment notes, as well as the other opinion evidence contained in the record. (*Id.* at 12.) The Commissioner contends the "record as a whole paints a less restrictive picture of [Mason's] mental functioning abilities than does Dr. Kaza's August 2015 opinion." (*Id.* at 13.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[6] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source

---

[6]   Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[7]   Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment

opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

---

> relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406.  Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'"  *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. App'x 498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 Fed. App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

Moreover, an ALJ must consider the findings and opinions of the state agency medical consultants, because the "Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."  20 C.F.R. §404.1513a(b)(1).  When doing so, an ALJ will evaluate the findings using the relevant factors in §§ 404.1520b, 404.1520c and 404.1527, such as the consultant's medical specialty and expertise, the supporting evidence in the case record, consistency of the consultant's opinion with evidence from other sources in the record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.  20 C.F.R. § 404.1513a(b)(2).  Finally, an ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant unless a treating physician's opinion has been accorded controlling weight.  *See* 20 C.F.R § 404.1527(e).

After a lengthy discussion of the medical evidence, the ALJ weighed the opinion

evidence from Dr. Kaza as follows:

> In addition, as ordered by the Appeals Council, I have considered the August 11, 2015, Medical Source Statement-Mental by Koteswaria R. Kaza, M.D., the claimant's treating psychiatrist.  His source statement is given partial weight, as consistent with the objective and hearing level evidence as a whole, giving less weight to his opinions as to marked limitations, as they are not supported by the record at the time of his August 2015 nor thereafter.  (Exhibit 15F)  More specifically, he opined marked deficiencies of concentration, persistence, and pace, resulting in failure to complete tasks in a timely manner (in work settings or elsewhere) (Exhibits 15F/5), as well as marked limitations as to ability to interact with supervisor(s); deal with work stresses; function independently; maintain attention/concentration; understand, remember, and carry out complex job instructions; and understand, remember, and carry out detailed (not complex) job instructions (Exhibit 15F/2-5).  However, when Dr. Kaza evaluated the claimant a few months earlier, on June 16, 2015, he found that her thought process was organized, and she was oriented times three. The claimant indicated that she had finished a grief group, and it helped her cope with things.  In fact, she stated that the group went to the country club to eat, and since the group was over, she was trying to keep busy.  Dr. Kaza advised the claimant to continue Adderall for concentration and focus as to everyday tasks, such as paying bills and grocery shopping, and he did not note any significant objective findings.  He reported that the claimant was talkative, functioning, and denied suicidal thoughts and plans.  (Exhibit 12F/20-21).  This evidence is inconsistent with marked mental deficiencies and limitations. Otherwise, as to Dr. Kaza's August 2015 source statement, he opined that the claimant was "not significantly limited" to "moderately limited," which is more consistent with the objective and other hearing level evidence, and therefore, given greater weight.  For example, he opined that the claimant was moderately limited as understanding, remember, and carrying out simple job instructions and as to abilities following work rules, relating to co-workers, dealing with the public, and using judgment. (Exhibit 15F/2-3).  These opinions are consistent with the above-discussed evidence.  Further, he opined that the claimant had no restriction of activities of daily living, which seems inconsistent with his assessment of marked difficulties.  Also, he only opined slight difficulties in maintaining social functioning, despite conversely opining moderate difficulties as to relating to co-workers and the public.  Moreover, while he opined no significant limitations as to maintaining personal appearance, as previously indicated, I have given the claimant the benefit of the doubt in finding that she has moderate mental limitations overall, which are accommodated by the residual functional capacity.  (Exhibit 15F/3-6).

(Tr. 26-27.)

As an initial matter, the Court notes the RFC adopted (or was not inconsistent with) several of the functional limitations assessed by Dr. Kaza in his August 2015 opinion. Specifically, the ALJ found Mason was limited to simple, routine, and repetitive tasks, simple decision-making, no fast-paced production requirements, few workplace changes, no interaction with the public, and no more than occasional interaction with co-workers and supervisors.  (Tr. 17.)  Because these specific limitations are consistent with portions of Dr. Kaza's opinion they need not be addressed in evaluating the ALJ's weighing of Dr. Kaza's opinion.  (*See* Tr. 683-684.)

The RFC conflicts, however, with the remainder of Dr. Kaza's opinion.  For the following reasons, the Court finds the ALJ properly evaluated this opinion.  The ALJ correctly noted Dr. Kaza was a treating source.  (Tr. 26.)  He declined to assign this opinion controlling weight, as he afforded it "partial weight," giving "less weight to [Dr. Kaza's] opinions as to marked limitations."  (Tr. 26-27.)  The ALJ explained these marked limitations were inconsistent with Dr. Kaza's own treatment notes and the opinion itself was internally inconsistent.  (Tr. 26-27.)  The ALJ cited directly to the record, noting specifically where Dr. Kaza's opinion was inconsistent with the treatment notes.  The ALJ observed in June 2015, just a few months prior to Dr. Kaza's opinion, Dr. Kaza found Mason to be, talkative, functioning, and learning to cope, with no suicidal thoughts or plans and an organized thought process.  (Tr. 26.)  Prior to discussing Dr. Kaza's opinion, the ALJ also provided a detailed overview of Mason's treatment notes from Dr. Kaza's practice, which revealed Mason's medications improved her symptoms and no significant mental status findings upon examination.  (Tr. 22-23.)

32

The ALJ also noted the existence of an internal inconsistency within Dr. Kaza's medical opinion.  The ALJ observed that on the one hand, Dr. Kaza opined Mason had "no restriction in activities of daily living," which seemed "inconsistent with his assessment of marked difficulties."  (Tr. 27.)  In addition, the ALJ noted Dr. Kaza found only "slight" difficulties in maintaining social functioning, while "conversely opining moderate difficulties as to relating to co-workers and the public."  (*Id*.)  Mason does not dispute the inconsistencies noted above are reasonable bases for discounting Dr. Kaza's opinion, nor does Mason contest the soundness of the ALJ's reasoning on any of these points.  The Court finds the inconsistencies and lack of supportability to be appropriate and reasonable bases for discounting Dr. Kaza's opinion.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004) (an ALJ should consider the supportability of the opinion and its consistency with the record as a whole).

Moreover, substantial evidence supports the ALJ's conclusion Dr. Kaza's findings of marked limitations are entitled to less weight.  In March 2014, Mason began to treat at Comprehensive Behavioral Health for depression.  (Tr. 581.)  She described poor focus, for which Dr. Kaza prescribed Adderall.  (Tr. 615.)  By November 2014, Mason's mood was stable, her anxiety had decreased, and her Adderall was doing "wonders" for her symptoms.  (Tr. 615.)  In late 2014 and early 2015, Mason reported depression and difficulty coping with her brother's death.  (Tr. 613, 611, 609, 605, 607.)  However, Dr. Kaza observed a "bright" appearance and a logical thought process.  (Tr. 611.)  Mason had good focus and concentration, was sleeping well, and denied panic attacks.  (Tr. 609, 602.)

Mason attended grief counseling in April and May 2015.  (Tr. 604, 602.)  She found the class to be helpful with coping with the loss of her brother.  (Tr. 600.)  During this time, Dr.

33

Kaza observed a "bright mood," organized thoughts, and improved concentration and anxiety. (Tr. 602, 604, 600.) In December 2015, Mason reported ongoing depression and poor focus, as well as episodes of staying in bed. (Tr. 736.) Her depression was noted to be worsening, but her thought process was logical. (Tr. 742, 743.)

In early 2016, Mason lost her insurance and this led to increased anxiety. (Tr. 791, 786.) However, she was able to get back on her medications, and by November and December 2016, they were working. (Tr. 751, 747.) She continued to report depression, secondary to several family-related stressors. (*Id.*) In December 2016, Mason underwent a consultative examination with Dr. Bousquet, where she confirmed her medications were helpful and she denied the need for any psychiatric hospitalization. (Tr. 724.) Dr. Bousquet concluded Mason would have difficulty managing stress and pressure, but could carry out simple and multi-step tasks. (Tr. 729-730.) These treatment notes establish Mason does have some degree of mental limitation, which the ALJ acknowledged, but not to the marked degree as opined by Dr. Kaza.

Mason asserts the "ALJ failed to address the fluctuating nature" of her mental health condition. (Doc. No. 20 at 8.) It is unclear how this relates to Dr. Kaza's opinion, because he did not provide any indication in his opinion that Mason's condition or limitations were in flux. (*See* Tr. 683-686.) Mason seems to suggest that because of the fluctuations in her mental health condition, the ALJ should have disregarded all of the normal examination findings made by Dr. Kaza in the treatment notes. (*See* Doc. No. 15 at 2-3.) However, the ALJ has an obligation to consider the record as a whole, not simply the evidence which Mason believes supports a finding of disability. *See Majeed v. Comm'r of Soc. Sec.*, 2017 WL 5952878, *6 (N.D. Ohio Oct. 12, 2017)("The ALJ has the responsibility for reviewing all the evidence in making his

determinations."), *report and recommendation adopted*, 2017 WL 5901023 (N.D. Ohio Nov. 30, 2017).

Moreover, the ALJ did acknowledge the "fluctuating nature" of Mason's mental impairments in the decision.  (Tr. 25.)  Indeed, the ALJ specifically discussed how Mason's counselor reported that her anxiety and depression "waxes and wanes," and that Mason's "mood is labile and depends mostly on the situation."  (*Id*.)  However, the ALJ concluded the RFC "more than fully accommodates" Mason's depression and anxiety.  (*Id*.)  Indeed, Mason does not explain how the RFC assessment does not properly account for the "fluctuating nature" of her mental health impairments.

Mason also contends Dr. Kaza's opinions are consistent with the two consultative examinations conducted by Dr. Brown.  (Doc. No. 20 at 9.)  As noted *supra*, Dr. Brown examined Mason in October 2013 and January 2014.  (Tr. 465, 530.)  Within his conclusion, he provided  restrictive limitations and low GAF scores.  (Tr. 472-473, 537-538.)  However, both of these examinations were conducted prior to Mason obtaining any outpatient mental health treatment.  Indeed, Mason did not begin treatment at Comprehensive Behavioral Health until March 2014. (Tr. 581.)  Her treatment notes indicate improvement in her symptoms with treatment and medications.  (Tr. 615, 613, 609, 607, 608.)  Moreover, Dr. Bousquet, who also conducted a consultative examination on Mason, reached a less restrictive conclusion than Dr. Brown.  (Tr. 729-730.)  While Mason presents Dr. Brown's consultative examinations as evidence to support her claim Dr. Kaza's opinion is entitled to controlling weight, this Court's review of the ALJ decision is based on the record as a whole.  The findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a

different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear an ALJ's decision "cannot be overturned if substantial evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). In this case, the ALJ clearly articulated his reasons for not affording Dr. Kaza's opinion controlling weight and these reasons are supported by substantial evidence.

Accordingly, the Court finds the ALJ met the burden of offering good reasons to support his decision to assign less than controlling weight to Dr. Kaza's opinion. Mason's first assignment of error, therefore, is without merit and does not provide a basis for remand.

**B.      Listing 1.02A**

In her second assignment of error, Mason argues the "ALJ failed to properly consider whether [her] left hip degenerative joint disease and total left hip replacement met the requirements for Listing 1.02A." (Doc. No. 20 at 10.) She asserts the "evidence of record raises a reasonable probability that the requirements of Listing 1.02 were met or equaled." (*Id*. at 12.) She characterizes the ALJ's step three discussion as "terse and boilerplate dismissal." (*Id*. at 10.) Finally, Mason concludes the "ALJ's conclusion at step three contradicts with his residual functional capacity," rendering the decision "internally inconsistent." (*Id*. at 13.)

The Commissioner maintains substantial evidence supports the ALJ's finding Mason did not meet Listing 1.02A. (Doc. No. 14 at 14.) She contends the ALJ "specifically addressed Listing 1.02A" in the decision and found Mason "did not meet the criteria for the listing as [her impairments] had not resulted in an inability to ambulate effectively." (*Id*. at 15.) The Commissioner asserts the "ALJ employed the proper standards in determining that [Mason] did

not meet or medically equal Listing 1.02A" because the ALJ specifically discussed the Listing at step three and "throughly summarized [Mason's] medical history in a detailed 20-page decision."  (*Id*. at 16.)

      At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

      Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 16 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

37

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec*., 424 Fed. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416.

Moreover, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual manner in another manner."  *Lett,* 2015 WL 853425 at *16.  *See also Ford v. Comm'r of Soc. Sec.,* 2015 WL 1119962 at *17 (E.D. Mich. March 11, 2015) (finding that "the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing"); *Mowry v. Comm'r of Soc. Sec.,* 2013 WL 6634300 at *8 (N.D. Ohio Dec. 17, 2013); *Hufstetler v. Comm'r of Soc. Sec.,* 2011 WL 2461339 at *10 (N.D. Ohio June 17, 2011).

Here, Mason's challenge to the ALJ's step-three analysis is limited to Listing 1.02A (major dysfunction of a joint).  This Listing is defined, in relevant part, as follows:

> **1.02 Major dysfunction of a joint(s) (due to any cause):** Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. § 404, Subpt. P, App. 1.  The "inability to ambulate effectively" is defined as follows:

38

> Inability to ambulate effectively means an extreme limitation of the ability
> to walk; i.e., an impairment(s) that interferes very seriously with the
> individual's ability to independently initiate, sustain, or complete activities.
> Ineffective ambulation is defined generally as having insufficient lower
> extremity functioning (see 1.00J) to permit independent ambulation
> without the use of a hand-held assistive device(s) that limits the functioning
> of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2(b)(1). The regulations provide further

guidance regarding effective ambulation, as follows:

> To ambulate effectively, individuals must be capable of sustaining a
> reasonable walking pace over a sufficient distance to be able to carry out
> activities of daily living.  They must have the ability to travel without
> companion assistance to and from a place of employment or school.
> Therefore, examples of ineffective ambulation include, but are not limited
> to, the inability to walk without the use of a walker, two crutches, or two
> canes, the inability to walk a block at a reasonable pace on rough or uneven
> surfaces, the inability to use standard public transportation, the inability to
> carry out routine ambulatory activities, such as shopping and banking, and
> the inability to climb a few steps at a reasonable pace with the use of a
> single hand rail.  The ability to walk independently about one's home
> without the use of assistive devices does not, in and of itself, constitute
> effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2(b)(2).

Here, the ALJ concluded Mason did not meet or equal any Listing.  (Tr. 13.)  His

analysis regarding Listing 1.02 was as follows:

> Her musculoskeletal problems, evaluated under sections 1.02 and 1.04
> have not resulted inability to ambulate effective, as defined in 1.00B2b; or
> resulted in inability to perform fine and gross movements effectively, as
> defined in 1.00B2c.  The medical evidence as a whole shows that she is
> able to ambulate effectively overall, and there is no evidence of nerve root
> compression, spinal stenosis, or spinal arachnoiditis.  Also, her
> osteoarthritis is not characterized by a gross anatomical deformity and
> chronic joint pain and stiffness, with signs of limitation of motion or other
> abnormal motion of the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony destruction,
> or ankylosis of the affected joint(s) with involvement of one major
> peripheral weight-bearing joint, resulting inability to ambulate effectively.

(Tr. 14.)  Later in the decision, at step four, the ALJ discussed the evidence regarding Mason's orthopedic impairments at greater length.  (Tr. 18-21.)  The ALJ acknowledged Mason's testimony she ambulates with a cane three times a week, due to pain and imbalance.  (Tr. 18.)  The decision noted Mason experienced a "full recovery" from her left total hip replacement in 2010.  (Tr. 19.)  The ALJ also discussed and analyzed the medical and opinion evidence regarding Mason's orthopedic impairments, including the physical examination findings in the record.  (Tr. 19-21, 25.)  He noted during her November 2016 consultative examination, Mason's gait was normal and she was not using any ambulatory aids.  (Tr. 19.)  The ALJ also discussed a January 2017 examination in which Mason's musculoskeletal examination was normal.  (Tr. 21.)  The ALJ acknowledged Mason was observed to be ambulating with a cane in March 2017, with decreased range of motion in her spine, ribs, and pelvis.  (*Id*.)

The Court finds substantial evidence supports the ALJ's conclusion Mason did not meet or equal the requirements of Listing 1.02.  As discussed *supra*, to satisfy Listing 1.02(A), Mason was required to demonstrate (1) a gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability); (2) chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint; (3) findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint; (4) involvement of either the hip, knee, or ankle; and (5) the inability to ambulate effectively.  20 C.F.R. §404, Subpt. P. App. 1.

While the ALJ did not specifically discuss subsection A of Listing 1.02, he did consider Listing 1.02 overall.  (Tr. 14.)  He found there was no evidence Mason had an inability to ambulate effectively, a gross anatomical deformity, or findings on "appropriate medical imaging

40

of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)."  (*Id.*)  Later in the decision, the ALJ discussed the success of Mason's 2010 left hip replacement, Mason's testimony that she used a cane several times a week due to pain, and the objective findings of a normal gait and the ability to walk and squat.  (Tr. 18-19.)  The ALJ also reviewed treatment notes indicating Mason often had normal physical examination findings.  (Tr. 20, 21.)  It is clear from this discussion the ALJ properly considered Listing 1.02.

Moreover, the ALJ's conclusion and discussion is consistent with the medical evidence. Under Listing 1.02, documentation of a gross anatomical deformity is required.  20 C.F.R. Part 404, Subpart P, Appendix 1, §1.02.  Mason points to no evidence she has a "gross anatomical deformity," the threshold requirement of Listing 1.02A.  Instead, Mason focuses the entirety of her argument on the issue of the definition of effective ambulation.  *See Drake v. Colvin*, 2014 WL 5431322, *10 (N.D. Ohio Oct. 24, 2014) ("Plaintiff has not argued or even attempted to demonstrate he suffers from a 'gross anatomical deformity.'").  While Martin suffered from degenerative joint disease of the left hip back in 2010, she underwent a total hip replacement for such.  (Tr. 404.)  X-rays following this operation indicate the left hip implant is in good position. (Tr. 413.)

Furthermore, Listing 1.02A also requires documentation on "appropriate medical imaging" of "joint space narrowing, bony destruction, or ankylosis of the affected joint."  20 C.F.R. Part 404, Subpart P, Appendix 1, §1.02.  Mason has not directed this Court's attention to any diagnostic testing to demonstrate any such abnormality in her lower extremity joints.  As Mason has not established either of these requirements, she cannot meet Listing 1.02A.  *See Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L.Ed.2d 967 (1990)("For a claimant to

41

show that [her] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

Mason asserts the ALJ's step three finding is not supported by substantial evidence because she unable to ambulate effectively. (Doc. No. 20 at 12-13.) This argument is without merit. While Mason testified she intermittently uses a single cane for ambulation, use of a single cane does not "limit the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2(b)(1). For this reason, district courts within this Circuit have consistently found that use of a single cane or crutch does not establish an inability to walk effectively for the purposes of Listing 1.02(A), 1.03, and 1.04C. *See, e.g., Sutton v. Berryhill,* 2017 WL 6568183, at *14 (N.D. Ohio Dec. 8, 2017), *report and recommendation adopted by*, 2017 WL 6558165 (N.D. Ohio Dec. 22, 2017); *Toskinski v. Comm'r of Soc. Sec.*, 2018 WL 1468706 at * 9 (N.D. Ohio March 26, 2018); *Brown v. Colvin,* 2016 WL 1068966 at * 10 (N.D. Ohio Feb. 5, 2016) *report and recommendation adopted*, 2016 WL 1071103 (N.D. Ohio March 17, 2016); *Rainey–Stiggers v. Comm'r of Soc. Sec.*, 2015 WL 729670 at * 6 (S.D. Ohio Feb. 19, 2015); *Jackson v. Comm'r of Soc. Sec.*, 2009 WL 612343, at *3 (E.D. Mich. Mar.6, 2009). *See also Forrest v. Comm'r of Soc. Sec.*, 591 Fed. Appx. 359, 366 (6th Cir. 2014) (finding claimant did not meet requirements of Listing 1.02 where he "used one cane at most, often went without, and could otherwise ambulate effectively during the relevant period.") There is no evidence in the record Mason was ever prescribed an assistive device which would limit both upper extremities, such as a walker, crutches, or two canes. In fact, there is no evidence Mason has ever been prescribed an assistive device at all. Indeed, treatment records reflect Mason generally

ambulated independently, without an assistive device and a normal gait. (Tr. 413, 868, 871, 874.)

  Mason contends her inability to ambulate effectively is demonstrated by the fact the ALJ found Mason required "a working environment where she can use a handheld assistive device for uneven terrain or prolonged ambulation" in the RFC. (Doc. No. 20 at 12-13.) She asserts because the Listings find "an inability to walk a block at reasonable pace on rough and uneven surfaces" as an example of ineffective ambulation, this RFC limitation essentially establishes she meets Listing 1.02A. (*Id.* at 13.) The Court is not persuaded by this argument. While the ALJ determined in the RFC[8] Mason required a cane on uneven terrain or with

---

  [8]  The ALJ formulated the following RFC for Mason:

   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that involves lifting up to 20 pounds occasionally, lifting/carrying up to 10 pounds frequently, standing/walking for up to 6 hours, and sitting up to 6 hours in an 8-hour workday, with normal breaks and the following limitations: allowance to alternate sitting and standing positions for up to 2 minutes, at 30 minute intervals, without going off task; no more than occasional postural movements, except for no climbing of ladders, ropes, or scaffolds; no repetitive rotation, flexion, or extension of the neck; **requires a handheld assistive device only for uneven terrain or prolonged ambulation** and the contralateral upper extremity can be used to lift and carry up to exertional limits; avoidance of concentrated exposure to extreme cold and heat, wetness and humidity, excessive noise, vibration, irritants such as fumes/odors/dust/poorly ventilated areas, and chemicals; avoidance of all exposure to unprotected heights, hazardous machinery, and commercial driving; limited to simple, routine, and repetitive tasks, requiring only simple decision, with no fast-paced production requirements and few workplace changes; no interaction with the public; and no more than occasional interaction with co-workers, and supervisors.

   (Tr. 16-17)(emphasis added).

43

prolonged ambulation, the ALJ did not find Mason had a complete inability to walk at a reasonable pace on rough and uneven surfaces, as required by Listing 1.00B2(b)(2).  (Tr. 16-17.) Moreover, Mason points to no medical evidence which demonstrates she is unable to walk at a reasonable pace on rough and uneven surfaces, instead focusing on this "inconsistency" within the ALJ's decision.  (*See* Doc. No. 20 at 13.)

Finally, Mason suggests the ALJ's step three discussion is "terse and boilerplate" and a "deficient analysis."  (Doc. No. 20 at 10.)  Although the ALJ's discussion of Listing 1.02 at step three is brief, the ALJ carefully listed the various requirements of Listing 1.02 and concluded Mason did not meet them.  (Tr. 14.)  Moreover, as discussed *supra*, the ALJ provided a detailed discussion at step four of Mason's orthopedic complaints and the treatment history of her hip. (Tr. 18-21.)  This discussion supported his step three conclusion and enables this Court to conduct a meaningful review of the decision.  *Goddard v. Berryhill*, 2017 WL 2190661, *17 (N.D. Ohio May 1, 2017), *report and recommendation adopted,* 2017 WL 2155391 (N.D. Ohio May 17, 2017).  *See also Kern v. Comm'r of Soc. Sec.,* 2017 WL 1324609, *2 (S.D. Ohio Apr. 11, 2017)("The Commissioner's decision may be upheld where the ALJ made sufficient factual findings elsewhere in his decision to support the conclusion at step three.").

Therefore, and for all the reasons set forth above, Mason's second assignment of error is without merit and does not provide a basis for remand.

**C.      Light RFC/Vacated ALJ decision**

In her final assignment of error, Mason argues the ALJ erred in finding she had the capacity to work at the light exertional level.  (Doc. No. 20 at 14.)  Rather than asserting this RFC is not supported by substantial evidence, Mason contends because the ALJ limited her to

44

work at the sedentary exertional level in the prior, vacated ALJ decision, the ALJ was required to explain how Mason's "physical condition improved since the time of the last decision." (*Id*. at 15.)  Mason asserts because she turned 50 prior to the date[9] of the ALJ decision, a finding she was limited to sedentary work would direct a finding of disability under the grid rules. (*Id*.)  The Commissioner fails to directly address Mason's argument, instead asserting the RFC is supported by substantial evidence. (Doc. No. 14 at 16-18.)

After the ALJ issued his initial August 11, 2015 decision, Mason sought review of this decision by the Appeals Council. (Tr. 131, 221.)  In September 2016, the Appeals Council vacated the ALJ's August 2015 decision and remanded the matter for further proceedings. (Tr. 154.)  Thereafter, the ALJ conducted a second hearing and issued a second decision on May 18, 2017. (Tr. 7, 48.)  The Appeals Council declined further review of this decision, thereby making the May 2017 decision the final decision of the Commissioner. (Tr. 1.)

The Court finds the ALJ was not required to explain any deviations between the August 2015 and May 2017 decisions.  The Appeals Council remand order provided  "[u]nder the authority of 20 C.F.R. 404.977, the Appeals Council vacates the hearing decision." (Tr. 156.) Therefore, when Mason's request for remand was granted, the August 2015 decision was vacated, and the ALJ was left to reconsider Mason's claims and medical evidence *de novo*. Thus, the prior RFC had no binding effect upon the ALJ on remand.

Indeed, "a decision vacated by the Appeals Council has no *res judicata* effect." *Williams v. Astrue*, at *6 (N.D. Ohio Mar.14, 2012).  *See also Wireman v. Comm'r of Soc. Sec*.,

---

[9]     This is incorrect. Mason was born in November 1967 and therefore attained age 50 in November 2017.  (Tr. 100.)  The ALJ issued his decision in May 2017, prior to Mason's 50th birthday.  (Tr. 7.)

45

60 Fed App'x 570, 571 (6th Cir. Mar. 19, 2003). Here, because the ALJ was not bound by his August 2015 decision, the ALJ was not required to justify any discrepancies between the RFC findings in his decisions. *Zayid v. Comm'r of Soc. Sec.*, 2014 WL 517466, *6 (N.D. Ohio Feb. 7, 2014). *See also Thomas v. Astrue*, 2011 WL 4632009, *5 (N.D. Ohio Sept. 30, 2011)("to the extent that Plaintiff is challenging the findings contained with the ALJ's vacated opinion, Plaintiff's challenges are moot as [the vacated ALJ decision] is not currently before the Court on review."); *Berry v. Comm'r of Soc. Sec.*, 2018 WL 3077608, *3-4 (S.D. Ohio June 21, 2018)(finding it "irrelevant" a vacated ALJ decision's RFC varied from the RFC assessed in a second ALJ decision). Mason does not cite to any statute, regulation, or case which suggests otherwise.

Accordingly, Mason's third assignment of error is without merit and does not provide a basis for remand.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 6, 2019

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**